E-FILED
Saturday, 18 March, 2023  07:14:16 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

### URBANA DIVISION

| | |
|---|---|
| Tim Tribble, individually and on behalf of all others similarly situated, | 2:23-cv-02060 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Adidas America, Inc., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.     Adidas America, Inc. ("Defendant") manufactures, manufactures, labels, markets, and sells NHL (National Hockey League) jerseys represented as "authentic" under the Adidas brand (the "Product").



2.     Sales of sports merchandise in the United States is close to $20 billion per year.

3.     This generates millions of dollars for teams through royalties and is an increasingly important revenue source.

4.     According to the author of The Fastest Game in the World: Hockey and the Globalization of Sports, "The current popularity of the[se] colorful, oversized shirts is the result of changes in marketing and fan culture, in hockey as well as other sports."[1]

5.     Until relatively recently, "fans went to the arena in everyday street clothes," and "The trend of putting on what the players wore first emerged in European soccer in the 1980s."

6.     Berglund noted that "NHL crowds from the early '90s show that most fans didn't give second thought to what they wore."

7.     However, just "A decade later, [] Detroit's Joe Louis Arena was awash in red and white [jerseys and team apparel] when the Red Wings won the cup."




---

[1]   Bruce Berglund, How Hockey Jerseys Became Standard Wear for Fans https://www.ucpress.edu/blog/53836/how-hockey-jerseys-became-standard-wear-for-fans/ University of California Press Blog December 18, 2021

## I.    RISE IN POPULARITY OF TEAM JERSEYS

8.    Observers credit the jerseys of the Los Angeles Kings, San Jose Sharks and Anaheim Mighty Ducks with showing franchises how lucrative jerseys and team apparel could be.

9.    The colors and design of these teams' jerseys in the early 1990s was a spark to all professional hockey teams that this was a lucrative growth area.

10.    The fashion designer Tommy Hilfiger remarked that hockey jerseys were unique amongst other professional sports because of their "great shape and appealing colors" "And it's cool because hockey is kind of a rough sport."

11.    One sociologist explained commitment to a particular sports team "crosses many areas of society such as wealth, position, race, and religion."[2]

12.    The most significant – and expensive – of such merchandise is the team jersey, often bearing the name of the wearer's favorite player.

13.    The jersey signifies the fan's loyalty to his or his team and provides an opportunity to enhance a relationship with the team.

14.    One apparel executive recognized this fact, stating "We're selling emotion, observed not just a product."[3]

15.    This is supported by relatively low sales for specialty jerseys designed to mark an event or occasion, as opposed to standard jerseys players wear on-ice each night.[4]

---

[2] Norm O'Reilly, et al., "Merchandise sales rank in professional sport: Purchase drivers and implications for National Hockey League clubs," Sport, Business and Management: An International Journal (2015).

[3] Tim Layden, We are what we wear: How sports jerseys became ubiquitous in the U.S., Sports Illustrated, Feb. 1, 2016.

[4] https://keenerjerseys.com/jerseys-unite-teams-fans-and-communities/

## II.    VARIETIES OF JERSEYS

16.    National retailer Dick's Sporting Goods identified the three types of hockey jerseys as Authentic, Official, and Replica.[5]

17.    According to Dick's, "Not all jerseys are cut from the same cloth," because "Some might be designed for in-game action, while others are best suited for your gameday party."

18.    By knowing the "differences between authentic and replica jerseys," fans can "match [their] gear to [their] needs."

19.    Hockey jerseys identified as "authentic" "are the on-ice apparel worn by your favorite professional team."

20.    This is consistent with historical usage and understanding, because for decades, "authentic" in the context of NHL jerseys referred to jerseys worn on the ice by NHL players.

21.    Adidas has even argued to federal courts that there is a difference between what it currently sells to consumers and what those same consumers want to and think they are buying, noting that "a replica uniform will not be 'authentic' and, therefore, not desirable to consumers unless it contains all the elements of the uniform worn in competition."

22.    There are several distinct criteria to identify authentic hockey jerseys.

23.    First, authentic hockey jerseys have "a tailored fit and premium fabric."

24.    Second, "authentic hockey jerseys [have] the included fight strap [], the added fabric that helps players keep their sweater from being pulled over their eyes during a scrum."

25.    Third, authentic hockey jerseys use "moisture-wicking technologies to keep fans dry whether on the ice or in the stands."

26.    Fourth, authentic hockey jerseys have "Twill numbers and lettering," indicative of

---

[5] Authentic vs. Replica Jerseys: What's the Difference?, Pro Tips, Dick's Sporting Goods.

4

their "premium craftsmanship."

27.    In contrast to authentic hockey jerseys, replicas "often feature screen printed or iron-on letters and numbering" and "use[s] lesser grade fabrics."

28.    Dick's recommends that replicas "can be good for fans wanting apparel *resembling* pro-grade without breaking the bank." (emphasis added).

## III.   JERSEYS MISLEADINGLY IDENTIFIED AS "AUTHENTIC"

29.    Consumers purchasing NHL jerseys marketed as "authentic" by the company which makes the jerseys worn by NHL teams will expect they are purchasing jerseys identical to those worn on the ice by NHL players.[6]

30.    On its website and in digital, print, radio and/or television marketing, Defendant promotes the jerseys as "The Official Home Game Jersey of the Winnipeg Jets," telling hockey fans it is an "authentic home game jersey," "Imported" and "Officially licensed by the NHL."



_____

[6] AJ Strong, Stop Calling Adidas NHL Jerseys Authentic, Teal Town USA, June 29, 2021.

5

31.     Defendant authorizes third-parties, such as Fanatics.com, official team stores, and the NHL to sell its jerseys and provides them with specific language to use in its marketing.

32.     At its instructions and directions, third-party stores and websites such as fanatics.com identify these jerseys as "authentic" by labeling them with names such as "Authentic Pro Player Jersey."



33.     Defendant capitalizes on consumers believing and expecting the jerseys are authentic, shown through one website description that "this jersey is the same as the one Oilers players wear when the puck drops on the road."[7]

**OILERS AWAY AUTHENTIC PRO JERSEY**

THE OFFICIAL AWAY GAME JERSEY OF THE EDMONTON OILERS.

Celebrate Edmonton hockey as they turn up the intensity away from home. Featuring an authentic tie-down fight strap with a hook-and-loop and snap closure, this jersey is the same as the one Oilers players wear when the puck drops on the road. The relaxed fit provides extra room.

---

[7] The representations for the team identified here are substantially similar or identical to those made for all NHL teams.



**OILERS AWAY AUTHENTIC PRO JERSEY**

*THE OFFICIAL AWAY GAME JERSEY OF THE EDMONTON OILERS.*

Celebrate Edmonton hockey as they turn up the intensity away from home. Featuring an authentic tie-down fight strap with a hook-and-loop and snap closure, this jersey is the same as the one Oilers players wear when the puck drops on the road. The relaxed fit provides extra room.

34.     Defendant describes its "Authentic Pro Player jersey" for the Detroit Red Wings as "Featuring sewn-on team graphics, a tie-down fight strap and moisture-absorbing AEROREADY fabric, this jersey features the same details that Dylan Larkin wears on game day."

**Description**                                                      –

There's nothing more exciting than watching Dylan Larkin hit the ice and lead the Detroit Red Wings to a win. Cheer on this top NHL player with this Authentic Pro Player jersey from adidas. Featuring sewn-on team graphics, a tie-down fight strap and moisture-absorbing AEROREADY fabric, this jersey features the same details that Dylan Larkin wears on game day. Take any fan look to the next level with this must-have Detroit Red Wings jersey.

35.     That these jerseys are "the same as [] players wear" is confirmed to purchasers due to features which would only be relevant in on-ice jerseys, by highlighting its functionality.

36.     These include its promotion of "AEROREADY [which] keeps you cool and dry," "[A] mesh underarm insert," "Primegreen, a series of high-performance recycled materials," "Loose fit," "Moisture absorbing" and having an "Authentic tie-down fight strap with a hook-and-loop snap closure."

Captured at: 03/18/2023, 07:12 PM
URL: https://hockeyauthentic.com/produ
cts/any-name-and-number-winnipeg-jets
-reverse-retro-authentic-adidas-nhl-jerse
y-customized-primegreen-model

**THIS JERSEY WILL FEATURE PROPER HAND STITCHED SINGLE LAYER TWILL CUSTOMIZATION LIKE THE PLAYERS WEAR.**

- Officially licensed by the NHL
- Official NHLPA name and number pro stitched just like the players wear
- 100% polyester
- Made with Primegreen - a series of high-performance recycled materials
- Authentic tie-down fight strap with hook-and-loop and snap closure

37.    A "fight strap" refers to the attachment on a hockey jersey which keeps it on the wearer during a fight and prevents a player from having their jerseys pulled over their head, rendering them vulnerable to the opposing player.

38.    There is no reason to include a "fight strap" on a jersey that is not meant to be worn on-ice, because this is solely a utilitarian feature relevant to being on skates in a hockey fight.

39.    By emphasizing that the Product is made with a fight strap, consumers will expect it is identical to on-ice jersey.

40.    However, despite the representations as "authentic," the jerseys are not those worn on-ice by NHL players.

41.    The jerseys have more in common with what is commonly described as "replica" or even counterfeit authentic jerseys than those worn by players on the ice during games.

42.    First, the fight straps in Defendant's authentic jerseys are lower quality than in the on-ice jerseys worn by the players.

43.    In the on-ice jersey, the fight strap contains a double layered reinforced base, while

8

it is affixed through a single stitched layer in the authentic jersey sold to Plaintiff and consumers.

On-ice Jersey        Authentic

44.    This is visible when the two are closely compared, because the fight strap on Defendant's authentic jerseys (top) are not as thickly or securely attached to the fabric as the on-ice jerseys (bottom).



45.    Second, the fabric in the authentic jerseys (top) is half the thickness of the fabric used in the on-ice jerseys (bottom) worn by NHL players.



46.   While it is not possible to view the thickness side-by-side through the flat picture, the neck area of the authentic jerseys is noticeably thinner than the same area of the on-ice jerseys.

47.   Third, the stitching used in the authentic jerseys (left) is weaker and less durable than in the on-ice jerseys (right). worn by NHL players.



48.   In the authentic jerseys, the seam inside the red circle does not even look sewn together by stiches, compared to the same area in the on-ice jerseys, which shows multiple cross-

stiches between the two parts of the jersey.

49.    Fourth, the neck hole in on-ice jerseys (top) is smaller than in Defendant's jerseys (bottom).



50.    Fifth, the "dimples" or small holes throughout the fabric are significantly different.



51.    In the on-ice jerseys (top), the dimples are significantly larger, because they were created through the machines which mechanically press the jersey.

52.    The dimples in the authentic jerseys (bottom) appear added solely for aesthetics.

53.     This difference is relevant because these small holes allow air to flow through the jersey, an important feature relevant to its on-ice performance.

54.     The smaller dimples in the Adidas authentic jerseys render them less efficient at dealing with moisture and airflow than the on-ice jerseys.

55.     Sixth, the logos, numbers, stripes, and names on the authentic jerseys are generally applied via heat pressing instead of the double-stitching on the on-ice jerseys.

56.     Seventh, the authentic jerseys are "Made in Indonesia" while the on-ice jerseys are "Made in Canada."

57.     Canada is generally considered a more technologically advanced nation than Indonesia, which produces higher quality garments and textiles.

58.     Canada is also "the Birthplace of [ice] hockey," where "[I]t originated around 1800" "in Windsor, Nova Scotia."[8]

59.     As the world leader – and inventor of hockey – Canada has institutional knowledge of all aspects of this winter sport, passed down through generations of craftsmen.

60.     In contrast, the tropical temperature of Indonesia has never been suitable for playing ice hockey.

61.     The relevance of the smallest details on a hockey jersey are more easily recognized in the place hockey was invented than anywhere else.

62.     The authentic jerseys (middle) are closer to counterfeit Adidas NHL jerseys (bottom) than to those worn on the ice by NHL players (top).

---

[8] Garth Vaughan, Origin Overview Quotes Prove Ice Hockey's Origin, 1999.



63.    The representation of the Product as "authentic" is misleading, because they are more accurately described as "replicas."

64.    Defendant has been aware that eagle-eyed consumers have discovered the differences between its authentic jerseys and those worn by players on the ice.

65.    First, a website devoted to covering the San Jose Sharks, TealTownUsa.com, published an article by AJ Strong, entitled, "Stop Calling Adidas NHL Jerseys Authentic," in June 2021.

66.    Strong provided detailed facts about why "it's disingenuous and misleading for Adidas to call [the jerseys] 'authentic' or 'authentic pro'" and recommended "Adidas [] call[s] those jerseys what they are… replicas."

67.    Strong also notified Adidas that the prices of their "authentic" jerseys were $50 greater than what comparable replica NHL jerseys are sold for.

68.    Second, another fan of the San Jose Sharks, the well-known memorabilia and video game blogger known as "Rezrection," expounded on Strong's points about these jerseys.

69.    Rezrection posted a video to his YouTube channel entitled, "Do Not Buy Adidas NHL Authentic Hockey Jerseys Before Watching This Video! What You Need To Know!"

70.    Over nine minutes, Rezrection isolated numerous ways in which the authentic Adidas NHL jerseys were deficient compared to the on-ice jerseys.

71.    Rezrection cautioned his viewers to be careful about paying almost as much for the authentic jerseys as the on-ice jerseys would cost, given what he described as stark differences in quality.

72.    Hockey fans at the popular website reddit.com weighed in on the controversy.

73.    One commenter posited that "[T]he reason they market the current Indodidas as 'authentic' is because … Fanatics has the contract to sell replicas."[9]

74.    This is why Adidas "slap[s] a fight strap on some incredibly cheap replicas and brand them as 'authentic.'"

75.    However, "If Adidas were to bring the MiC [Made in Canada worn by players] to retail and market it (or even quietly hang one in the team store next to the Indos), the illusion that the current retail jerseys are authentic would be broken in the eyes of the average fan."

76.    The result would be that "Adidas would lose out on sales on the far more lucrative replica 'authentic' market that they currently have cornered."

77.    Another user remarked that:

> It's not just calling them authentic. It's saying stuff like "the official home game jersey" or the fact that in the beginning they were marketed as "on ice" jerseys, which they clearly are not.
>
> To those who don't follow this stuff, they would think they are getting what the players wear and they

---

[9] Stop Calling Adidas NHL Jerseys Authentic - Teal Town USA, Reddit.com; Indodidas used by poster to refer to Indonesian-made "authentic" jerseys instead of Canadian-made actual authentic jerseys worn by NHL players.

most definitely are not.



**Captured at: 03/18/2023, 07:53 PM**
**URL: https://www.reddit.com/r/hockeyjerseys/comments/o**
**alx5b/stop_calling_adidas_nhl_jerseys_authentic_teal/**

[deleted] · 2 yr. ago

It's not just calling them authentic. It's saying stuff like "the official home game jersey" or the fact that in the beginning they were marketed as "on ice" jerseys, which they clearly are not.

To those who don't follow this stuff, they would think they are getting what the players wear and they most definitely are not.

⬆ 4 ⬇  Share  ···

78.     Adidas, like most large companies, regularly monitors social media for mentions of its brand, and was informed, directly or through its agents, of the issues identified by Strong and Rezrection.

<u>Jurisdiction and Venue</u>

79.     Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

80.     The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

81.     Plaintiff is a citizen of Illinois.

82.     Defendant is a citizen of Oregon.

83.     The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

84.     The members of the class Plaintiff seeks to represent are more than 100, because the Adidas authentic jerseys are sold to consumers from its website, third-party retail sporting goods stores and websites, team shops at NHL arenas, and licensed apparel retailers in the States Plaintiff seeks to represent for the past several years.

85.     Venue is in this District with assignment to the Urbana Division because a substantial part of the events or omissions giving rise to these claims occurred in Coles County, including Plaintiff's purchase, reliance on the identified statements, and/or subsequent awareness they were false and misleading.

## Parties

86.     Plaintiff Tim Tribble is a citizen of Charleston, Coles County, Illinois.

87.     Defendant Adidas America, Inc. is an Oregon corporation with a principal place of business in Portland, Oregon, Multnomah County.

88.     Adidas manufactures uniforms, including jerseys, for the National Hockey League.

89.     Consumers know they can trust a sportswear product with Adidas' well-known three stripes to deliver what it promises.

90.     Plaintiff purchased the Adidas authentic NHL jerseys including the Winnipeg Jets White Reverse Retro 2.0 Authentic Jersey identified above within the past two years at locations including official NHL retailers online and/or in person, for close to $200.

91.     Plaintiff believed the Product was authentic, understood as being the same jersey that the Winnipeg Jets wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

92.     Plaintiff relied on the Product's features such as its fight strap, to believe it was the one worn on ice by the players.

93.     Plaintiff read, reviewed, and relied on Defendant's representations that the jerseys were authentic and/or was exposed to its language on the hang tags and internet sites that he was buying the same jerseys worn by players "when the puck drops" on the ice.

94.     Plaintiff was aware the jerseys had features such as an "authentic tie-down fight strap

with a hook-and-loop and snap closure," which serve no purpose in a jersey not designed and sold for use on the ice by NHL players.

95.  Plaintiff bought the Product because he expected it was authentic, and the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit, because that is what the representations said and implied.

96.  As a result of the false and misleading representations, the Adidas "authentic" jerseys are sold at premium prices, approximately not less than $150, excluding tax and sales.

97.  Plaintiff relied on the words, descriptions, layout, tags, images, and website descriptions on Defendant's site and those of its third-party partners, about its authentic jerseys.

98.  Plaintiff was disappointed because he believed the Product was authentic, understood as being identical to that worn on the ice by NHL players during games, even though it was not the same jersey worn by members of the Winnipeg Jets and other NHL players.

99.  Plaintiff bought the Product at or exceeding the above-referenced price.

100.  Plaintiff would not have purchased the Product if he knew the jerseys were not identical to those worn on the ice by NHL players, or would have paid less for them.

101.  Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components, as those worn on the ice by NHL players.

102.  Plaintiff paid more for the Product than he would have had he known the representations and omissions were false and misleading, or would not have purchased it.

103.  The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

104.  Plaintiff intends to, seeks to, and would purchase Adidas authentic jerseys again

when he can do so with assurances those jerseys were identical to those worn on the ice by NHL players.

105.  Plaintiff is unable to rely on the labeling of not only Adidas authentic NHL jerseys, but other sports apparel represented as authentic, because he will be unsure of whether those representations are truthful.

106.  If Defendant was compelled to truthfully describe its hockey jerseys as "replicas" and not "authentic," Plaintiff would have more confidence in the promises of other companies selling sportswear described as authentic.

<u>Class Allegations</u>

107.  Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of South Carolina, Kentucky, Mississippi, South Dakota, Iowa, Maine and West Virginia, who purchased the Product during the statutes of limitations for each cause of action alleged.

108.  Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

109.  Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

110.  Plaintiff is an adequate representative because his interests do not conflict with other members.

111.  No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

112. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

113. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

114. Plaintiff seeks class-wide injunctive relief because the practices continue.

Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, *et seq.*
(Illinois Class)

115. Plaintiff incorporates by reference all preceding paragraphs.

116. Plaintiff purchased the Product believing it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

117. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts
(Consumer Fraud Multi-State Class)

118. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

119. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

120. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability/Fitness for a Particular Purpose</u>
<u>and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

121.  The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

122.  Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions, and targeted digital advertising.

123.  Defendant knew the product attributes that potential customers like Plaintiff were seeking, such as pro-stock, on-ice game-ready hockey jerseys with features like a fight strap, real pressed dimples, stitched logos, names, and numbers, and developed its marketing and labeling to directly meet their needs and desires.

124.  The representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

125.  Defendant's representations affirmed and promised that the Product was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

126.  Defendant described the Product so Plaintiff believed it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit, which became part of the basis of the bargain that it would

conform to its affirmations and promises.

127. Defendant had a duty to disclose and/or provide non-deceptive promises, descriptions and marketing of the Product.

128. This duty is based on Defendant's outsized role in the market for NHL jerseys, the official manufacturer of the jerseys worn on the ice by NHL players, and known as a leader in sportswear.

129. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

130. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties.

131. Defendant received notice and should have been aware of these issues due to complaints by consumers and third-parties, including regulators and competitors, to its main offices and through online forums.

132. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

133. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

134. The Product was not merchantable because Defendant had reason to know the particular purpose for which they were bought by Plaintiff, because he expected that it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit, and he relied on its skill and judgment to

select or furnish such a suitable product.

Negligent Misrepresentation

135.  Defendant had a duty to truthfully represent the Product, which it breached.

136.  This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the official manufacturer of NHL jerseys, and known as a leader in sportswear.

137.  Defendant's representations regarding the Product went beyond the specific representations affixed to the jerseys and describing them on its own websites and those of its third-party sellers, as they incorporated its extra-labeling promises and commitments to quality, as the manufacturer of actual on-ice NHL jerseys

138.  These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

139.  Defendant capitalized on the intense connection that fans like Plaintiff have with their favorite hockey team to entice them to buy – and wear – the same jerseys worn by their favorite players during NHL games.

140.  The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

141.  Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, his purchase of the Product.

Fraud

142.  Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

22

143.  Defendant understands the differences between authentic and replica jerseys, and has stated that "a replica uniform will not be 'authentic' and, therefore, not desirable to consumers unless it contains all the elements of the uniform worn in competition."

144.  Defendant was aware of the distinctions between replica and authentic jerseys due to its history and involvement as a producer of jerseys for the NHL and other athletic leagues.

145.  Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations.

146.  Defendant knew of the issues described here yet did not address them.

147.  Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations, because it was made from different materials, using different methods, which resulted in jerseys of lower quality than those worn on the ice by NHL players.

Unjust Enrichment

148.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.  Certifying Plaintiff as representative and the undersigned as counsel for the classes;

2.  Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3.  Awarding monetary, statutory and/or punitive damages and interest;

4.  Awarding costs and expenses, including reasonable attorney and expert fees; and

5.  Other and further relief as the Court deems just and proper.

Dated:   March 18, 2023

Respectfully submitted,

/s/ Spencer Sheehan

Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com