# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| TIM TRIBBLE, on behalf of himself and on behalf of similarly situated individuals, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 23-CV-2060 |
| ADIDAS AMERICA, INC., | ) ) | |
| Defendant. | ) ) | |

## ORDER

Plaintiff, Tim Tribble, on behalf of himself and others similarly situated, filed his Amended Class Action Complaint (#11) against Defendant, Adidas America, Inc., on August 1, 2023, alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (815 Ill. Comp. Stat. 505/1 et seq.); breaches of express warranty and Magnuson-Moss Warranty Act (15 U.S.C. § 2301, et seq.); and claims of Illinois common law fraud and unjust enrichment.  Defendant filed a Motion to Dismiss (#13) on September 14, 2023, to which Plaintiff filed a Response (#15) on October 17, 2023.

## BACKGROUND

The following background is taken from the allegations in Plaintiff's Amended Complaint.  At this stage of the proceedings, the court must accept as true all material allegations of Plaintiff's Amended Complaint, drawing all reasonable inferences therefrom in Plaintiff's favor.  See *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016).

*General Allegations on Hockey Jerseys*

Defendant manufactures, labels, markets, and sells National Hockey League ("NHL") jerseys represented as "authentic" under the Adidas brand ("the Product"). Hockey jerseys are increasingly popular among the NHL fanbase, generating millions of dollars in revenue each year.

Varieties of Jerseys

National retailer Dick's Sporting Goods has identified the three types of hockey jerseys as "authentic," "official," and "replica."[1]  According to Dick's, "Not all jerseys are cut from the same cloth," because "[s]ome might be designed for in-game action, while others are best suited for your gameday party."  By knowing the "differences between authentic and replica jerseys," fans can "match [their] gear to [their] needs."

Hockey jerseys identified as "authentic" "are the on-ice apparel worn by your favorite professional team."  Plaintiff alleges that this "is consistent with historical usage and understanding, because for decades, 'authentic' in the context of NHL jerseys referred to jerseys worn on ice by NHL players."  Plaintiff alleges that Defendant has argued to federal courts that there is a difference between what it currently sells to consumers and what those same consumers want to buy and think they are buying, noting that a "replica uniform will not be 'authentic' and, therefore, not desirable to consumers unless it contains all the elements of the uniform worn in competition."

---

[1]Plaintiff's Amended Complaint contains the citation to Pro Tips, Dick's Sporting Goods, "Authentic vs. Replica Jerseys: What's the Difference?", https://dev-cms.dickssportinggoods.com/protips/sports-and-activities/soccer/authentic-vs-replica-jerseys-whats-the-difference (last visited February 16, 2024).

According to the Dick's Sporting Goods article, there are several distinct criteria to identify authentic hockey jerseys.  First, authentic hockey jerseys have "a tailored fit and premium fabric."  Second, "authentic hockey jerseys [have] the included fight strap [], the added fabric that helps players keep their sweater from being pulled over their eyes during a scrum."  Third, authentic hockey jerseys use "moisture-wicking technologies to keep fans dry whether on the ice or in the stands."  Fourth, authentic hockey jerseys have "[t]will numbers and lettering," indicative of their "premium craftsmanship."  In contrast, replica jerseys "often feature screen printed or iron-on letters and numbering" and "use lesser grade fabrics."  Dick's Sporting Goods recommends that replicas "can be good for fans wanting apparel *resembling* pro-grade without breaking the bank." (Emphasis added by Plaintiff).

<u>Jerseys Misleadingly Identified as "Authentic"</u>

Plaintiff alleges that consumers purchasing NHL jerseys marketed as "authentic" by Defendant, the company that makes the jerseys worn by NHL teams, will expect they are purchasing jerseys identical to those worn on the ice by NHL players.

By way of example, on its website and in digital, print, radio, and/or television marketing, Defendant promotes the jerseys as "The Official Home Game Jersey of the Winnipeg Jets," telling fans it is an "authentic home game jersey," "imported," and "officially licensed by the NHL."

3

Defendant authorizes third parties, such as Fanatics.com, official team stores, and the NHL to sell its jerseys and provides them with specific language to use in its marketing.  At Defendant's instructions and directions, third-party stores and websites identify these jerseys as "authentic" by labeling them with names such as "Authentic Pro Player Jersey."

Defendant capitalizes on consumers believing and expecting the jerseys are authentic.  By way of example, Plaintiff cites to a description of an Edmonton Oilers jersey made by Defendant on Fanatics.com that "this jersey is the same as the one the Oilers players wear when the puck drops on the road."  Defendant alleges that the representations made for the Edmonton Oilers are substantially similar to those made by Defendant for all NHL teams.

Another example is Defendant's Detroit Red Wings "authentic pro player jersey," described as featuring "sewn-on team graphics, a tie-down fight strap and moisture-absorbing AEROREADY fabric, this jersey features the same details that [Red Wings player] Dylan Larkin wears on game day."  Plaintiff alleges that the phrase "these jerseys 'are the same as [] the players wear' is confirmed to purchasers due to features which would only be relevant in on-ice jerseys, by highlighting its functionality."  These include the promotion of "AEROREADY [which] keeps you cool and dry," a "mesh underarm insert," "Primegreen, a series of high-performance recycled materials," "loose fit," "moisture-absorbing," and having an "authentic tie-down fight strap and with a hook-and-loose snap closure."

4

A "fight strap" refers to the attachment on a hockey jersey which keeps it on the wearer during a fight and prevents a player from having their jersey pulled over their head, rendering them vulnerable to an opposing player.  There is no reason to include a fight strap on a jersey that is not meant to be worn on-ice, because this is solely a utilitarian feature relevant to being on skates in a hockey fight.  By emphasizing that the Product is made with a fight strap, consumers will expect it is identical to an on-ice jersey.

However, despite the representations as "authentic," the jerseys are not those worn on-ice by NHL players.  The jerseys have more in common with "replica" jerseys or even counterfeit jerseys.  First, the fight straps on Defendant's authentic jerseys are lower quality than on the on-ice jerseys worn by the players.  On the on-ice jerseys, the fight strap contains a doubled layered reinforced base, while on the authentic jerseys sold to Plaintiff and consumers the strap is affixed through a single stitched layer. Plaintiff alleges that, as seen in the pictures included in the Amended Complaint, this is visible when the two are closely compared, because the authentic jersey fight strap is not as thickly or securely attached to the fabric as the on-ice jersey.

Second, Plaintiff alleges that the thickness in the authentic jersey is half the thickness of the fabric used in the on-ice jersey worn by NHL players.  Plaintiff provided comparison pictures, noting that the neck area of the authentic jersey is noticeably thinner than the same area of the on-ice jersey.

Third, Plaintiff alleges that the stitching used in the authentic jerseys is weaker and less durable than in the on-ice jerseys worn by NHL players.  Citing to comparison pictures included in the Amended Complaint, Plaintiff alleges that the seam does not

look sewn together by stitches, compared to the same area in the on-ice jerseys, which shows multiple cross-stitches between the two parts of the jersey.

Fourth, the neck hole in the on-ice jerseys is smaller than in Defendant's jerseys.

Fifth, the "dimples" or small holes throughout the fabric are significantly different. Plaintiff again provided pictures to demonstrate the comparison. In the on-ice jerseys, the dimples are significantly larger, because they were created through machines that mechanically press the jersey. The dimples in the authentic jerseys, in contrast, appear added solely for aesthetics, a difference that is relevant because these small holes allow air to flow through they jersey, an important feature for on-ice performance. The smaller dimples in the authentic jerseys render them less efficient at dealing with moisture and airflow than the on-ice jerseys.

Sixth, the logos, numbers, stripes, and names on the authentic jerseys are generally applied via heat pressing instead of the double-stitching on the on-ice jerseys.

Seventh, the authentic jerseys are "Made in Indonesia," while the on-ice jerseys are "Made in Canada." Plaintiff alleges that Canada is generally considered a more technologically advanced nation than Indonesia, which produces higher quality garments and textiles. Canada is also the "birthplace of ice hockey," where the sport originated around 1800. As the world leader and inventor of hockey, the country has institutional knowledge of all aspects of the game, "passed down through generations of craftsmen." Plaintiff alleges Defendant's authentic jerseys are closer to the counterfeit jerseys than they are the on-ice genuine article.

Reaction Among NHL Fans to Defendant's Authentic Jerseys

Plaintiff alleges that Defendant is aware that "eagle-eyed" consumers have discovered the differences between its authentic jerseys and those worn on-ice.  First, a website devoted to the San Jose Sharks, TealTownUsa.com, published an article by AJ Strong in June 2021 entitled "Stop Calling Adidas NHL Jerseys Authentic," in which Strong argued that it is "disingenuous and misleading for Adidas to call [the jerseys] 'authentic' or 'authentic pro'" and recommended that Defendant "call those jerseys what they are ... replicas."  Strong also notified Defendant that the prices for the authentic jerseys were $50 greater than what comparable replica NHL jerseys were sold for.

Second, another San Jose Sharks fan known as "Rezrection" posted a video to his Youtube channel entitled "Do Not Buy Adidas NHL Authentic Hockey Jerseys Before Watching This Video!  What You Need To Know!"  In the video, Rezrection discussed numerous ways in which the authentic jerseys were deficient compared to the on-ice jerseys, and cautioned his viewers to be careful about paying almost as much for the authentic jerseys as the on-ice would cost, given what he described as the stark differences in quality.

Third, Plaintiff cites to various comments on Reddit, where commenters refer to the authentic jerseys derisively as "Indodidas," because they are made in Indonesia, not Canada, and claim that Defendant is trying to deceive unwary consumers into thinking they are getting on-ice quality jerseys, when they are not.

*Allegations Specific to Plaintiff*

<u>Parties</u>

Plaintiff is a citizen of Charleston, Coles County, Illinois.  Defendant is a citizen of Oregon.  In 2015, Defendant agreed to be the official apparel manufacturer for the NHL. Plaintiff alleges that consumers know they can trust a sportswear product with Defendant's well-known three stripes to deliver what it promises.

<u>Plaintiff's Purchase of Defendant's Jersey</u>

Plaintiff purchased his men's Winnipeg Jets Adidas White Reverse Retro 2.0 Authentic Blank Jersey ("the Product") from the NHL Shop Website operated by Fanatics.com in December 2022.  Plaintiff paid $189.99, excluding tax and shipping. Plaintiff believed the Product was authentic, which he understood as being the same jersey that the Winnipeg Jets wear during hockey games, from the fight strap to the dimples to the stitching and the fit.  Plaintiff relied on the Product's features, such as the fight strap, to believe it was the one worn on-ice by players.

Plaintiff "read, reviewed, and relied on Defendant's representations that the jerseys were authentic and/or was exposed to its language on the hang tags and internet sites that he was buying the same jerseys worn by players 'when the puck drops' on the ice."  Plaintiff was aware the Product had features such as an "authentic tie-down fight strap with a hook-and-loop and snap closure," which serves no purpose in a jersey not designed and sold for use on the ice by NHL players.  Plaintiff bought the Product because he expected it to be authentic, and the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit, because this is what the representations said and implied.

8

As a result of the false and misleading representations, the Product is sold at a premium price. Plaintiff relied on the words, descriptions, layout, tags, images, and website descriptions on Defendant's website and those of its third-party partners, about its authentic jerseys. Plaintiff was disappointed because he believed that the Product was authentic, which he understood as being identical to that worn on the ice by NHL players during games, even though it was not the same jersey worn by members of the Winnipeg Jets and other NHL players.

Plaintiff bought the Product at the above-stated premium price, and would not have purchased the Product were it not for the false and misleading statements and if he knew that it was not identical to those worn on-ice by NHL players, or he would have paid less for it. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components, as those worn on the ice by NHL players.

The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant. Plaintiff intends to, seeks to, and would purchase Defendant's authentic jerseys again when he can do so with assurances that those jerseys were identical to those worn on-ice by NHL players.

*Plaintiff's Claims*

Plaintiff, in his Response at page 1, footnote 1, states that he withdraws his claims for breaches of express and implied warranties and the violations of the Magnuson-Moss Warranty Act, as well as his claim for unjust enrichment. This leaves only his ICFA and Illinois common law fraud claims.

In support of his ICFA claim, Plaintiff alleges that he purchased the Product believing it was authentic, and understood authentic as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit. Plaintiff would not have purchased the Product or paid as much if the true facts had been known.

In support of his fraud claim, Plaintiff alleges that Defendant misrepresented and/or omitted the attributes and qualities of the Product by claiming it was authentic, which Plaintiff understood as being the same jersey that NHL players wear during games. Plaintiff alleges that Defendant understands the differences between authentic and replica jerseys, and has stated that "a replica uniform will not be 'authentic' and, therefore, not desirable to consumers unless it contains all the elements of the uniform worn in competition."

Plaintiff alleges that Defendant was aware of the distinctions between replica and authentic jerseys due to its history and involvement as a producer of jerseys for the NHL and other athletic leagues. Plaintiff alleges that the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided Defendant with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations. Plaintiff alleges that Defendant knew of the issues described in his pleading, yet did not address them. Plaintiff alleges that Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations, because it was made from different materials, using different methods, which resulted in jerseys of lower quality than those worn on the ice by NHL players.

10

ANALYSIS

Defendant argues that Plaintiff's Amended Complaint should be dismissed because: (1) Plaintiff's ICFA and fraud claims have not been pled with the particularity required by Federal Rules of Civil Procedure 8(a) and 9(b) and Plaintiff has not alleged sufficient facts to support those claims; (2) Plaintiff's ICFA and fraud claims fail because he has not identified a deceptive statement about his white Winnipeg Jets jersey; and (3) Plaintiff's fraud claim should be dismissed because he has not pled scienter with particularity.

Plaintiff responds that: (1) he has also alleged an ICFA claim based on unfair conduct, which is not subject to Rule 9(b) particularity requirements; (2) he has pled facts sufficient to state an ICFA deceptive practices claim; and (3) the Amended Complaint "exceeds particularity requirements for fraud."

I.       *Rule 12(b)(6) Standard*

Under Federal Rule of Civil Procedure 8(a)(2), a pleading stating a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Federal Rule of Civil Procedure 12(b)(6) allows for dismissal of a pleading if it fails "to state a claim upon which relief can be granted[.]"  "Dismissal for failure to state a claim under Rule 12(b)(6) is proper 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief.'" *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  "[T]he complaint must contain allegations that 'state a claim to relief that is plausible on its face' or it is subject to dismissal under Rule 12(b)(6)." *Virnich*, 664 F.3d at 212, quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  The complaint's factual

allegations must be enough to raise a right to relief above the speculative level, meaning the complaint must contain allegations plausibly suggesting, not merely consistent with, an entitlement to relief. *Virnich*, 664 F.3d at 212. "A claim has facial plausibility when the plaintiff pleads 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Virnich*, 664 F.3d at 212, quoting *Iqbal*, 556 U.S. at 678.

While the court must, in reviewing a plaintiff's claim, accept the well-pleaded facts in the complaint as true and draw all reasonable inferences in the plaintiff's favor, the court is not bound to accept legal conclusions as true, and conclusory allegations merely reciting the elements of the claim are similarly not entitled to the presumption of truth. *Burger v. County of Macon*, 942 F.3d 372, 374 (7th Cir. 2019); *Virnich*, 664 F.3d at 212.

Claims of fraud are subject to a heightened pleading standard under Federal Rule of Civil Procedure 9(b), which states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The Seventh Circuit has written, on the issue:

> As one district court has noted, the particularity requirement of Rule 9(b) is designed to discourage a "sue first, ask questions later" philosophy. *Berman v. Richford Indus., Inc.*, 1978 WL 1104, at *5 (S.D.N.Y. July 28, 1978); see also *Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 748–49 (7th Cir. 2005) (the particularity requirement "forces the plaintiff to conduct a careful pretrial investigation" and minimizes the risk of extortion that may come from a baseless fraud claim); *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 594 (7th Cir. 2003) (the particularity requirement protects defendants from "privileged libel").

In adding flesh to the bones of the word particularity, we have often incanted that a plaintiff ordinarily must describe the "who, what, when, where, and how" of the fraud—"the first paragraph of any newspaper story." *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009). Yet, because courts and litigants often erroneously take an overly rigid view of the formulation, we have also observed that the requisite information—what gets included in that first paragraph—may vary on the facts of a given case. *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998) (flexibility when information lies outside of plaintiff's control); *In re HealthCare Compare Corp. Secs. Litig.*, 75 F.3d 276, 285 (7th Cir. 1996) (Ripple, J., dissenting) (noting that reasonable minds can and will differ on the adequacy of a given fraud averment); see also *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993) ("What constitutes 'particularity' will necessarily differ with the facts of each case...."). The twin demands of detail and flexibility, though in tension with one another, make sense in light of the competing purposes of the federal rules. Heightened pleading in the fraud context is required in part because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled. At the same time, the adoption of the Federal Rules of Civil Procedure constituted a self-conscious departure from prior pleading regimes that emphasized form for form's sake. See also 2 James Wm. Moore, Moore's Federal Practice § 9.03[1][b], at 9–18 (3d ed. 2010) (although "plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts," they still must "use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud"); David Marcus, The Federal Rules of Civil Procedure and Legal Realism as a Jurisprudence of Law Reform, 44 Ga. L. Rev. 433, 471 (2010) (contending that Charles Clark, one of the primary drafters and exponents of the federal rules, used code- and common-law pleading instrumentally as the "foil[s] for his procedural jurisprudence").

*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreens Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011).

I.      *ICFA Claims*

"The ICFA is a 'regulatory and remedial statute intended to protect consumers ...

against fraud, unfair methods of competition, and other unfair and deceptive business

practices.'" *Geske v. PNY Technologies, Inc.*, 503 F.Supp.3d 687, 704 (N.D. Ill. 2020),

quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002).  The ICFA

prohibits "unfair or deceptive acts or practices, including but not limited to the use or

employment of any deception, fraud, false pretense, false promise, misrepresentation or

the concealment, suppression or omission of any material fact, with intent that others

rely upon the concealment, suppression or omission of such material fact ... in the

conduct of trade or commerce ... whether any person has in fact been misled, deceived

or damaged thereby."  815 Ill. Comp. Stat. 505/2.

"The elements of a claim under ICFA are: (1) a deceptive or unfair act or practice

by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or

unfair practice; and (3) the unfair or deceptive practice occurred during a course of

conduct involving trade or commerce."  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir.

2010).  "The statute allows a plaintiff to premise her claim on either deceptive conduct

or unfair conduct (or both), but 'the two categories have different pleading standards.'"

*Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019), quoting

*Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019).  "If the claim rests

on allegations of deceptive conduct, then [Federal Rule of Civil Procedure] 9(b) applies

and the plaintiff must plead with particularity the circumstances constituting fraud."

14

*Vanzant*, 934 F.3d at 738.  "This means as a practical matter that she must identify the 'who, what, when, where, and how' of the alleged fraud[,]" whereas "Rule 9(b)'s heightened pleading standard does not apply to an allegation of unfair conduct, because fraud is not a required element under that branch of the statute."  *Benson*, 944 F.3d at 646.

Here, Plaintiff argues that he has premised his ICFA claim on both the deceptive practices and unfair conduct prong.

A.    Whether Plaintiff Has Stated an Unfair Conduct ICFA Claim

"A plaintiff may allege that conduct is unfair under ICFA without alleging that the conduct is deceptive."  *Siegel*, 612 F.3d at 935.  Whether a practice is unfair depends on a case-by-case analysis.  *Siegel*, 612 F.3d at 935.  The Illinois Supreme Court adopted a three-prong test to determine unfairness and "held a defendant's conduct must: (1) violate public policy; (2) be so oppressive that the consumer has little choice but to submit; and (3) cause consumers substantial injury."  *Siegel*, 612 F.3d at 935, citing *Robinson*, 775 N.E.2d at 961.  "A court may find unfairness even if the claim does not satisfy all three criteria."  *Siegel*, 612 F.3d at 935.  Further, the injury must: (1) be substantial; (2) not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) be an injury that consumers themselves could not reasonably have avoided.  *Siegel*, 612 F.3d at 935.

Unfair conduct claims are not subject to Rule 9(b)'s particularity requirements, so Defendant's argument about Plaintiff's failure to plead with particularity does not apply to this claim. Defendant, in its Motion to Dismiss, does not address the unfair conduct portion of the ICFA, focusing its argument only on the deceptive practice prong of the ICFA. See Motion to Dismiss Memorandum (#14), at pp. 5-14. Defendant does have one passing sentence on page 8 of its Memorandum that states: "Even if Plaintiff were to somehow assert that any of these claims could be construed to fall outside the scope of Rule 9(b), they would still fail because he has not pleaded the necessary facts to support them even under the more permissible Rule 8(a) standard." In his Response, Plaintiff simply states that he has raised an unfair conduct claim along with a deceptive practice claim, and that the former is not subject to the Rule 9(b) heightened pleading standard. Defendant has not requested to file a Reply to respond to this argument.

Because Defendant offered no specific argument that the unfair conduct claim should be dismissed, Plaintiff's ICFA unfair conduct claim *should* survive. However, an examination of Plaintiff's Amended Complaint does not reveal any specific pleading based on unfair conduct, or the elements of unfair conduct quoted above from the *Siegel* case. This leaves the court in a conundrum. Defendant has made no real argument that an unfair conduct claim should be dismissed. Plaintiff argues in response that he has raised such a claim and it should not be dismissed, but the pleading itself does not appear to state an unfair conduct claim.

16

As the court reads the Amended Complaint, Plaintiff's claims are based entirely on the "false and misleading representations" made by Defendant that the Product was "authentic" and the same jersey as that worn on the ice by real NHL players, which induced Plaintiff to purchase the white Winnipeg Jets jersey.  While Plaintiff does allege, in the class allegations portion of his Amended Complaint, that his "claims and basis for relief are typical to other members because all were subjected to the same *unfair*, misleading, and deceptive representations, omissions, and actions[,]" (emphasis added) that is the only time unfairness is mentioned in his pleading, whereas the terms "false" and "misleading" are mentioned three and nine times, respectively.[2]

Although Plaintiff added the term "unfair" to his pleading, his allegations of "unfair conduct" (upon which he does not elaborate in his Response) are clearly premised upon the primary claim that Defendant utilized a fraudulent sales technique to induce him to purchase what he thought was an "authentic" NHL jersey.  Simply adding language of "unfairness" instead of "misrepresentation" does not alter the fact that Plaintiff's allegations, as currently alleged, are entirely grounded in fraud under the ICFA.  See *Camasta v. Joseph A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) ("Here, Camasta claims that he was induced to purchase shirts from JAB by their 'fraudulent sales practices' that 'mislead,' 'misrepresent, and 'defraud.' While Camasta adds language of unfairness, his allegations of 'unfair practice' are clearly premised

---

[2]The court would also note that "fraud" or "fraudulent" appears four times and "misrepresent" appears twice.

upon the primary claim that JAB utilized a fraudulent sales technique. Simply adding language of 'unfairness' instead of 'misrepresentation' does not alter the fact that Camasta's allegations are entirely grounded in fraud under the ICFA.").  Therefore, the court cannot find that Plaintiff has adequately pled an ICFA unfair conduct claim, and to the extent the Amended Complaint attempts to allege one, it is dismissed.

However, if Plaintiff chooses to file a second amended complaint and allege unfair conduct, the court would recommend, for purposes of clarity, that Plaintiff plead his ICFA unfair conduct claim in a separate subsection from his ICFA deceptive practice claim, and that Plaintiff plead which particular allegations he believes constitute an ICFA unfair conduct claim.  See Fed. R. Civ. P. 10(b).

B.      Whether Plaintiff Has Stated a Deceptive Practice Claim Under the ICFA

1.      Whether Plaintiff Has Pled With Particularity

Defendant first argues that, based on the allegations in the Amended Complaint, Plaintiff has not stated a claim for deceptive practices under the ICFA with the particularity required by Rule 9(b).  Defendant argues that the allegations in the pleading are vague and lack the requisite specificity to satisfy the heightened pleading requirement.  Specifically, Defendant argues that, although Plaintiff points to a series of representations from various websites and unidentified labels and hang tags, he does not identify which, if any, of these materials he viewed and whether he saw them prior to purchasing his white Winnipeg Jets jersey.

Defendant argues that Plaintiff does not allege what statements he actually read or "was exposed to," when or where he read them, and whether he did so prior to purchase.

Plaintiff responds that he has satisfied the particularity requirement because he has alleged that he "read, reviewed, and relied on" "the words, descriptions, layouts, tags, images, and website descriptions on Defendant's site and those of its third-party partners, about its authentic jerseys."

As stated above, Rule 9(b) requires that a plaintiff ordinarily must describe the "who, what, when, where, and how" of the fraud, although the Seventh Circuit has recognized that the requisite information—what gets included in that first paragraph—may vary on the facts of a given case. *Pirelli*, 631 F.3d at 442. Still, "[o]ne of the purposes of the particularity and specificity required under Rule 9(b) is 'to force the plaintiff to do more than the usual investigation before filing his complaint.'" *Camasta*, 761 F.3d at 737, quoting *Ackerman v. Northwestern Mutual Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). "While Rule 9(b) 'does not require a plaintiff to plead facts that if true would show that the defendant's alleged misrepresentations were indeed false, it does require the plaintiff to state 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Camasta*, 761 F.3d at 737, quoting *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir.1992). While the Seventh Circuit does not require that a plaintiff provide the precise date, time, and

location that they saw the advertisement or every word that was included on it,

something more than a general assertion such as a product was offered at "sale prices"

is needed.  See *Camasta*, 761 F.3d at 737.

Central to Defendant's argument are two district court cases (also filed by

Plaintiff's counsel against Defendant) involving near identical allegations about

"authentic" NHL jerseys: *Inouye v. Adidas America, Inc.*, 2023 WL 2351654 (M.D. Fla.

Mar. 3, 2023), and *Smith v. Adidas America, Inc.*, — F.Supp.3d —, 2023 WL 5672576

(N.D.N.Y. Sept. 1, 2023).[3]

In *Inouye*, the plaintiff sued Defendant for the same reasons as in the present

case.  The plaintiff was a resident of Hillsborough County, Florida, and "purchased the

Product on one or more occasions between November and December 2021 at stores

including Fanatics and at locations including fanatics.com."  *Inouye*, 2023 WL 2351564,

at *1.  He purchased the Product because of his belief that it was "authentic," which he

understood to mean "genuine and substantially similar or identical" to the jerseys worn

by NHL players, and, in doing so, "relied on the words, descriptions, layout, packaging,

tags, and images on the Product, on the labeling, statements, omissions, and claims

made by Adidas or at its direction in digital, print and social media, which

---

[3]*Inouye* and *Smith* are a district court cases from out-of-circuit.  However, even though they are not binding authority, the court may still find them to be persuasive. See *Koerner v. Experian Information Solutions, Inc.*, 2023 WL 2631571, at *5 (N.D. Ill. Mar. 24, 2023), citing *Wrice v. Byrne*, 488 F.Supp.3d 646, 658 (N.D. Ill. 2020) (finding "out -of-circuit precedent is not binding, though it may be persuasive").

accompanied the Product and separately, and through in-store, digital, audio, and print marketing." *Inouye*, 2023 WL 2351564, at *1.

The plaintiff sued for common law fraud and deceptive practices under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). The district court found that the FDUTPA claim sounded in fraud, and therefore applied the heightened pleading standard under Rule 9(b). *Inouye*, 2023 WL 2351564, at *3. The court began its particularity analysis by noting that "[c]ourts in this district have found FDUTPA claims insufficiently pled under Rule 9(b) where the complaint does not explain when the plaintiff viewed the alleged misrepresentations." *Inouye*, 2023 WL 2351564, at *3, citing *PB Property Management, Inc. v. Goodman Manufacturing Company, L.P.*, 2013 WL 12172912, at *7 (M.D. Fla. Aug. 28, 2013). In the *PB Property Management* case, the plaintiff sued under FDUTPA, claiming that the defendants made misrepresentations, on both their website and in a press release, concerning an allegedly defective product. *Inouye*, 2023 WL 2351564, at *3, citing *PB Property Management*, 2013 WL 12172912, at *1. "The court dismissed the FDUTPA claim, reasoning that plaintiff's failure to allege 'when Plaintiff viewed the alleged misrepresentations on Defendants' website, or even whether it — or any other consumer — viewed them at all before purchasing the allegedly defective products' did not satisfy the pleading requirements of Rule 9(b)." *Inouye*, 2023 WL 2351564, at *3, citing *PB Property Management*, 2013 WL 12172912, at *7.

The court also pointed to another district court case, *Jackson v. Anheuser-Busch InBev SA/NV, LLC*, 2021 WL 3666312 (S.D. Fla. Aug. 18, 2021), where the court found that allegations of misleading statements on a defendant's website did not meet the heightened Rule 9(b) pleading requirement. "There, the court evaluated allegedly misleading statements by a brewery concerning whether it was a 'craft' brewery[,]" and, citing to *PB Property Management*, "the court found that because plaintiff failed to allege when or whether misstatements on product labels or the defendant's website were viewed, plaintiff had failed to provide 'detailed and particularized facts' concerning the fraud claim." *Inouye*, 2023 WL 2351564, at *4, quoting *Jackson*, 2021 WL 3666312 at *13.

Turning to the case before it, the *Inouye* court found that, like in *PB Property Management* and *Jackson*, the plaintiff did not state when he viewed the alleged misrepresentations on either Defendant's or the third parties' websites. *Inouye*, 2023 WL 2351564, at *4. While the plaintiff's allegation that he "would not have purchased the Product or paid as much if the true facts had been known" implied that he viewed the allegedly misrepresentative statements before purchasing the Product, he did not indicate whether he did so on Defendant's website, the Fanatics website, or on the product labels. *Inouye*, 2023 WL 2351564, at *4.

Indeed, because the plaintiff alleged that he purchased the product from Fanatics, rather than directly from Defendant, the court determined it was unable to discern whether he viewed the alleged misrepresentations on Defendant's website at all

before purchasing the product.  *Inouye*, 2023 WL 2351564, at *4.  Likewise, while the plaintiff alleged that he purchased the product at various times during November through December 2021, he did not indicate when he viewed the allegedly deceptive product labels or whether he viewed the labels at all prior to purchase.  *Inouye*, 2023 WL 2351564, at *4.  Although the plaintiff "indicated when he *purchased* the Product, he did not indicate when he *viewed* the alleged representation."  *Inouye*, 2023 WL 2351564, at *4 (emphasis in original).

Importantly, because of this, the court concluded, the plaintiff had not sufficiently plead the "causation" element of his FDUTPA claim.  *Inouye*, 2023 WL 2351564, at *4.  "While Mr. Inouye alleges that the misleading statements induced him to purchase the product, he does not allege with particularity that he was induced by the misleading statements of Adidas[,]" or, "[p]ut differently, Mr. Inouye has failed to allege 'whether [he] viewed [the alleged misrepresentations] at all before purchasing the allegedly defective products.'"  *Inouye*, 2023 WL 2351564, at *4, quoting *PB Property Management*, 2013 WL 12172912, at *7.  Thus, without alleging that he viewed misrepresentations attributable to Defendant—whether on Defendant's website, or through product labeling on third-party websites—the court found the plaintiff could not support a claim under the FDUTPA and dismissed the claim without prejudice. *Inouye*, 2023 WL 2351564, at *4.

*Smith* is another case (filed by Plaintiff's counsel against Defendant) over allegedly misleadingly marketed "authentic" NHL jerseys.  In purchasing the jersey, the plaintiff "read, reviewed, and relied on Defendant's representations that the jerseys '[were] the same as the one[s] … players wear when the puck drops' on the ice."  *Smith*, — F.Supp.3d —, 2023 WL 5672576, at *1.

The district court considered the plaintiff's common law fraud claim under Rule 9(b)'s heightened pleading standard,[4] and found the allegations lacking.  The court found that the plaintiff had not pled with particularity when Defendant's allegedly fraudulent statements were made or when or where the plaintiff purchased a jersey. *Smith*, — F.Supp.3d —, 2023 WL 5672576, at *11.  The court noted that the complaint did not identify the date of any of the allegedly misleading advertising, and, although the plaintiff claimed that he read and relied on the Defendant's representations, he did not allege when or where he purchased the jerseys.  *Smith*, — F.Supp.3d —, 2023 WL 5672576, at *11.

---

[4]The court found that the plaintiff had sufficiently pled a deceptive conduct claim under sections 349 and 350 of New York's General Business Law through Defendant's use of the word "authentic," because "drawing all inferences in Plaintiff's favor, Plaintiff has plausibly alleged that Defendant's representations of its jerseys could mislead a reasonable consumer to believe that the jerseys are the same as those worn on-ice by NHL players."  *Smith*, — F.Supp.3d —, 2023 WL 5672576, at *5.  However, the claim was not analyzed under Rule 9(b)'s heightened pleading standard because Defendant did not argue it, and because the Second Circuit had found that Rule 9(b) did not apply to claims under Section 349.  *Smith*, — F.Supp.3d —, 2023 WL 5672576, at *4 n.5, citing *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).

24

The court found that the plaintiff merely stated "that he 'purchased the Adidas authentic NHL jerseys described here within the statutes of limitations for each cause of action alleged, at stores and/or websites, including the website of Defendant, adidas.com and NHL.com, over the past three years, and/or among other times[,]'" and that the plaintiff provided "no more detail than this as to when (or how many times) in that three-year period he purchased a jersey or from which of the sources—Plaintiff's list of which includes a third-party website—he purchased it." *Smith*, — F.Supp.3d —, 2023 WL 5672576, at *11. Nor did the plaintiff indicate when he viewed Defendant's website or when the screenshots of Defendant's website embedded in the complaint were taken. *Smith*, — F.Supp.3d —, 2023 WL 5672576, at *11. The court accordingly found the plaintiff's fraud claim failed to pass muster under Rule 9(b). *Smith*, — F.Supp.3d —, 2023 WL 5672576, at *11.

Applying the analyses in *Inouye* and *Smith* to the present case, the court finds that, although it is a closer call than in those cases, Plaintiff has failed to meet the Rule 9(b) particularity requirements. Unlike in *Smith*, Plaintiff has specifically pled *when* (December 2022) and from *whom* (from the NHL Shop website operated by Fanatics.com). See *Smith*, — F.Supp.3d —, 2023 WL 5672576, at *11.

However, his Amended Complaint suffers from the same deficiency identified by the *Inouye* and *Smith* courts in that he has not pled *when* he viewed the alleged misrepresentations, or even whether he actually viewed them *prior* to purchase. *Inouye*, 2023 WL 2351654, at *4; *Smith*, — F.Supp.3d —, 2023 WL 5672576, at *11. In his

Response, Plaintiff points to two paragraphs in his Amended Complaint, paragraphs 113 and 117, in support of his argument that he did specifically plead when he saw the misrepresentations and that he saw them before the purchase, so as to induce his purchase of the Product.

Paragraph 113 states that Plaintiff "read, reviewed, and relied on Defendant's representations that the jerseys were authentic and/or was exposed to its language on the hang tags and internet sites that he was buying the same jerseys worn by players 'when the puck drops' on the ice." Paragraph 117 states that "Plaintiff relied on the words, descriptions, layout, tags, images, and website descriptions on Defendant's website and those of its third-party partners, about its authentic jerseys."

What is missing from paragraphs 113 and 117 is any date as to when Plaintiff viewed the misrepresentations, what specific site he viewed the misrepresentations on, and whether he actually viewed those misrepresentations *prior* to purchasing the Product. See *Inouye*, 2023 WL 2351654, at *4; *Smith*, — F.Supp.3d —, 2023 WL 5672576, at *11. While Plaintiff's allegation that he "would not have purchased the Product or paid as much if the true facts had been known" implies that he viewed the allegedly misrepresentative statements before purchasing the Product, he did not indicate whether he did so on Defendant's website, the Fanatics website, or on the product labels. See *Inouye*, 2023 WL 2351654, at *4. Rather, Plaintiff cites to paragraphs 113 and 117, which contain relatively vague boilerplate about relying on Defendant's website and those of third parties.

Plaintiff purchased the Product from Fanatics, but what specific misrepresentation was made on that specific site in relation to that jersey? Plaintiff alleges that he relied on, read, and reviewed the misrepresentations on "Defendant's website and those of its third-party partners[,]" but when did he do that? He purchased the Product from Fanatics, so when was he on Defendant's website so as to rely on Defendant's alleged misrepresentations? Was he induced based on misrepresentations he read on the Fanatics website at the time of purchase? Indeed, because Plaintiff alleges that he purchased the product from Fanatics, rather than directly from Defendant, the court is unable to discern whether he viewed the alleged misrepresentations on Defendant's website *at all* before purchasing the product. See *Inouye*, 2023 WL 2351654, at *4.[5]

The court finds the allegations in this case to be, essentially, identical to *Inouye*. While Plaintiff alleges that he purchased the product in December 2022, he does not indicate when he viewed the alleged misrepresentations and/or allegedly deceptive product labels or whether he viewed the misrepresentations or labels at all prior to purchase. See *Inouye*, 2023 WL 2351654, at *4.

---

[5]To the extent that Defendant would allege that the presence of the fight strap itself was a misrepresentation, and that he saw it before purchase, the court finds this would be insufficient. It is the affirmative representations of Defendant as to authenticity that form the core of deceptive practice claim. There is no allegation that the jersey depicted on the web page that Plaintiff used to purchase the Product was *not* the jersey he received.

Plaintiff argues that, because of the specific allegations in paragraphs 113 and 117, his pleading is distinguishable from *Inouye*, because in that case the plaintiff failed to show when he viewed the alleged misrepresentations, where he saw them, or whether he saw them prior to purchasing his jersey.  However, the plaintiff in *Inouye* alleged nearly the same language as Plaintiff relies on in the present case: "Mr. Inouye purchased the Product because of his belief that it was 'authentic,' which he understood to mean 'genuine and substantially similar or identical' to the jerseys worn by NHL players. In doing so, Mr. Inouye relied on the words, descriptions, layout, packaging, tags, and images on the Product, on the labeling, statements, omissions, and claims made by Adidas or at its direction in digital, print and social media, which accompanied the Product and separately, and through in-store, digital, audio, and print marketing."  *Inouye*, 2023 WL 2351654, at *4 (internal citation omitted).  What is missing from both the allegations in *Inouye* and the present case is exactly *when* the plaintiffs viewed those alleged misrepresentations.  Plaintiff does not need to provide the exact date, but *some* kind of date or specific allegation that he purchased the Product after viewing the alleged misrepresentations, and exactly where he viewed those representations instead of vague boilerplate, is required.  See *Camasta*, 761 F.3d at 737.

Perhaps it would appear that the court is being too strict in its requirement on specificity and too demanding of a plaintiff at the pleading stage of litigation, when all inferences should be taken in favor of Plaintiff.  But the absence of those particular words matters.

On September 1, 2023, just one month after the filing of the Amended Complaint in the present case, the *Inouye* court dismissed an identical claim filed by Plaintiff's counsel on particularity grounds specifically because the pleading did not say when the plaintiff viewed the misrepresentations and whether he actually viewed the representations prior to purchase. See *Inouye*, 2023 WL 2351654, at *4. That Plaintiff in the present case did not plead the date he viewed the representations or specifically whether he viewed them before purchase is of note to the court. It is either an oversight on Plaintiff's part, or it is intentionally left vague because Plaintiff either does not remember exactly when or where he viewed the misrepresentations or even whether he viewed them prior to purchase so as to induce him to buy the product, but either way, it is *pertinent*.

The court is not demanding Plaintiff plead an exact date and time that he saw the alleged misrepresentations. Rather, to satisfy the particularity requirement, the court is only requiring Plaintiff to plead: (1) what specific representation or representations he saw that induced him to purchase the Product; (2) where he saw it; and (3) when he saw it, in relation to his purchase of the Product in December 2022.

Without alleging that he viewed misrepresentations attributable to Defendant prior to purchase—whether on the Defendant's website, or through product labeling on third-party websites—Plaintiff cannot support a claim under the ICFA. See *Inouye*, 2023 WL 2351654, at *4. Plaintiff's ICFA deceptive practices claim is dismissed without prejudice.

29

2.       **Whether Plaintiff Has Pled Facts Sufficient for an ICFA Claim**

Defendant next argues that, even if Plaintiff has satisfied the Rule 9(b)

particularity requirement, he has not pled sufficient facts to support an ICFA deceptive

practice claim.  Defendant argues that: (1) Plaintiff has not identified any false or

misleading statement on Defendant's labeling or packaging (the "authentic" claim); (2)

he cannot use purported misrepresentations and deficiencies for products that he did

not purchase to buttress his claims; (3) he cannot rely on representations on third

parties' websites because he has not alleged any facts suggesting that Defendant

adopted, or was responsible for them; and (4) he cannot rely on statements made by

other consumers to suggest that his white Winnipeg Jets jersey lacks certain features.

"[A] practice is deceptive 'if it creates a likelihood of deception or has the

capacity to deceive.'"  *Benson*, 944 F.3d at 646, quoting *Bober v. Glaxo Wellcome PLC*, 246

F.3d 934, 938 (7th Cir. 2001).  "Courts apply a 'reasonable consumer' standard to

analyze the likelihood of deception[,]" and when "'analyzing a claim under the ICFA,

the allegedly deceptive act must be looked upon in light of the totality of the

information made available to the plaintiff.'"  *Benson*, 944 F.3d at 646, quoting *Davis v.

G.N. Mortgage Corp.*, 396 F.3d 869, 884 (7th Cir. 2005).

As the court has dismissed Plaintiff's ICFA deceptive practices claim for failure

to plead with particularity, the court need not address Defendant's Rule 12(b)(6)

sufficiency arguments at this time.

30

III.    *Illinois Common Law Fraud Claim*

The court also dismisses the Illinois common law fraud claim for failure to plead

with particularity under Rule 9(b), as it is based on similar claims of fraud and false

advertising as Plaintiff's ICFA deceptive practice claim.  See *DeMaso v. Walmart Inc.*, 655

F.Supp.3d 696, 704 (N.D. Ill. 2023); *Inouye*, 2023 WL 2351654, at *10.

IV.    *Dismissal Without Prejudice*

Plaintiff's ICFA and fraud claims are dismissed without prejudice.  As the court

stated in another recent ICFA and fraud case, *Mentzer v. Energizer Brands, LLC*, Case No.

23-CV-2028, Docket Entry (#19), at p. 31, the court does not believe Plaintiff's hurdle to

be insurmountable.  When and exactly where Plaintiff viewed the alleged

misrepresentations that induced him to buy the Product, specifically whether they were

prior to purchase, should be readily ascertainable.  Indeed, Plaintiff here faces an

arguably lower hurdle in repleading than the plaintiff in *Mentzer*.  Plaintiff will have 21

days to file a second amended complaint in accordance with this Order.

IT IS THEREFORE ORDERED:

(1)    Defendant's Motion to Dismiss (#13) is GRANTED.  Plaintiff's Amended

Complaint (#11) is DISMISSED without prejudice.  Plaintiff has 21 days to

file a second amended complaint, in conformance with this Order.  If

Plaintiff does not file a second amended complaint, this matter will be

dismissed with prejudice.

31

(2)     This matter is referred to the magistrate judge for further proceedings in

accordance with this Order.


ENTERED this 20th day of March, 2024.

s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE